versus Angela Escorsio et al. Mr. Marchesi.  May it please the Court, Peter Marchesi on behalf of the defense. With your permission, Judge, I'd like to reserve three minutes for rebuttal. This is an appeal from the denial of summary judgment on the grounds of qualified immunity below. I want to start out my argument by saying that contrary to the plaintiff's 28J letter, this appeal with a very minor, and I submit undisputed exception, is not about a challenge to the lower court's factual conclusions. The appeal is a challenge to the manner in which the lower court applied the law to either the undisputed facts or to the extent the facts were disputed to those facts viewed in a light most hospitable to the plaintiff. A number of issues have been presented in the briefs, but what I would like to do with the Court's indulgence is focus on two that, at least from my point of vantage, will likely serve as the tipping points for this appeal. The first is under the merits analysis of the deliberate indifference calculus, assuming, and I will for purposes of my argument, that there existed both a substantial risk of serious harm and further assuming the defendant's subjective knowledge of that risk. Did either defendant turn away from or culpably ignore the risk? The second issue that I'd like to focus on, if indeed there is a factual issue as to the first, and of course our position is that there is not, is would it have been obvious to a reasonable corrections officer in the position of the defendants that the actions they took violated the plaintiff's constitutional rights under the specific facts and in the particular context of the circumstances of this case? Here are facts that are undisputed. On October 3, 2009, Sergeant Dane Winslow put Mr. Lally on an enhanced observation status known as welfare watch. He did so because of, quote, and this comes from the log that was generated, statements made during the booking process and for medical reasons, close quote. Next, he assigned Mr. Lally to cell 135, which is in the booking and intake area of the jail and not in a regular housing unit. As a consequence of being on welfare watch and as a further consequence of being in the booking area or the intake area and not in the housing area, he was observed at least once every 15 minutes. No differently than any other detainee who was in the intake area? Correct, but as I point out in our brief and I use an example, if every other inmate or detainee in the booking area had been put on one-to-one observation status, which is what plaintiffs seem to argue should have happened, he still would have been treated the same. No, no, no. The question is whether doing what Winslow did and no more could be found by a jury to have culpably ignored the risk. I mean, there certainly were other things that Winslow could have done since you have conceded that he was aware at that time that the detainee in question was a suicide risk and that there was a substantial risk of harm. Yet he did not arrange for any immediate psychiatric consult. He did not put the detainee in a protective cell. He did not do any of a laundry list of other things. Instead, he treated him more or less like any other detainee. I understand that being on welfare watch required a log entry that wouldn't have occurred with other detainees, but that log entry had no consequence. I respectfully disagree, Judge Celia. He treated him similar to other detainees in the intake area. What he did, that's a big point. Normally, he would have gone into the housing area where he would only have been observed every 30 or 60 minutes. So he either – But isn't the question whether he treated him in a manner appropriate for a known suicide risk? The question is whether he culpably ignored or turned away from what he knew. And I think the case that I cited from the Fourth Circuit, Brown v. Harris, is instructive on this point, and it's very persuasive, and it's essentially on all fours. In that case, the corrections officer had somebody who was known to be a suicide risk observed on video. He didn't, as here, contact mental health. He didn't, as here, put him in a suicide garment. And he even admitted that he should have done those things. And the court said, maybe you were negligent, maybe you violated policies, maybe you were grossly negligent, but that's not as a matter of law, deliberate indifference. On top of that, placement on welfare watch and keeping him in the intake area not only substantially increased the frequency of observations, it ensured that he was seen by medical personnel. I concede they were not mental health personnel, although it is important to note that had he remained there another day, mental health personnel did come in the day following the suicide attempt. But he was seen by two separate nurses and – Well, what's the significance of that since he admittedly had no medical problems as such? You know, I mean, his problems weren't medical. Well, I think it's very important because he – Did these nurses do anything that was designed to detect his mental condition or – Well, first of all, they – The risk of suicide? They, first of all, verified his medications, one of which is a psychiatric medication, Adderall XR. Second of all, one of the nurses, Nurse Lowe, testified – it's on page 26 of her deposition and cited in our briefs – that one of the things that she does – and concededly, neither one of these nurses many years later had a specific recollection of the interaction, but they had their notes and they know what their practice was. And Nurse Lowe said, one of the things I do is look at an inmate to see if they're despondent. Both nurses said they had made referrals for mental health care in the past. When they do that, they make a record of it, and there is no such record in this case. So that's very important that by being placed in intake, not only was he seen every 15 minutes as opposed to 30 or 60, but he also was seen on two separate occasions. And the third part of this, the log is important here. This is not papering the jails file. The log says, number one, why he was put on the watch. They didn't use the word suicide. That's a point that the plaintiff makes in her papers. But it said he was there because of statements made during the intake process or booking process and for medical reasons. That certainly alerts subsequent officers to the fact that something is amiss here, combined with the fact that What does the record show about the responsibility of other officers to look at the log? The log is there for them to look at. Well, yeah, but there's no procedure that directs them to look at it. That's not Sergeant Winslow's fault. That may be an institutional issue. That may be something that the sheriff or the jail administrator has to deal with. I've had this problem with your brief. I mean, you seem to make such a big deal about the fact that they're required to make entries in the log every 15 minutes. And from what I can see from this record, making an entry in this log is similar to, you know, throwing something up into the air. There's nothing that I can find in the record that requires anyone ever to consult this log or look at it. When they come on duty, they don't have to check the log to see what's what with the people who are currently in the intake area. I'll grant you that, Judge. So I'm struggling as to why you think it's significant that they have to make an entry in a log. I think it's significant because it goes to what Winslow did, which was to create this log where there is the opportunity for untoward actions to be documented and the opportunity for subsequent officers to look at it. It's not his job to set the policy of the jail and say everybody must look at that. It's not his job to set the policy, but he's on notice of the likely efficacy of his actions in requiring subordinates or other officers to make entries that there is no assurance or likelihood that anyone is ever going to look at can hardly be said to argue that he has suitably addressed the risk. Well, let's take the log out of the mix. Let's go back to, I think, the essential point. We haven't talked about qualified immunity yet. We're just talking about the merits analysis under the deliberate indifference calculus. The essential points are that by keeping him in booking, he was seen every 15 minutes as opposed to 30 or 60. That in and of itself, I think, gets you out of the deliberate indifference mix. You add to that the fact that as a consequence of being there, he was seen not once but twice, including the very warning of the incident, by medical personnel. And we're not talking about negligence here. We're talking about deliberate indifference. Now let's add to it the qualified immunity overlay. And plaintiff has suggested in brief that, well, you know, in this case there's no qualified immunity. It's subsumed by the merits analysis. And I think the cases that we've cited from this circuit clearly say the contrary. And what the cases say is that even though the variables in the equation are the same, the standards against which they are measured are very different. So the question is, is there some case out there that would have said to Winslow, we haven't talked about Scorsio yet, I'm down to a minute and a half, so I'll do that in my rebuttal, that what you are doing is ignoring the problem. And, you know, I think the error of the district court's analysis is in saying, well, it was clearly established that you can't be deliberately indifferent. It's clearly established that you have to take some measures to abate the risk. That's all fine and good. But this court, the Supreme Court, and sister circuits have all counseled against that level of generality. And what those courts in the Relegate case that I cited from the Eighth Circuit, I think, you know, hits the nail right on the head. It says, yeah, those broad propositions are established, but there is nothing in the law. And that court did an exhaustive search, and I've updated it since then. I see nothing that says anything that tells a corrections officer what is or isn't deliberately indifferent. So maybe Winslow made a bunch of mistakes. Maybe he should have called medical. Maybe he should have put him on a suicide smoke. Maybe he should have, could have, would have. That's not the issue. The issue is, would an officer in his position have known that he was violating the Plaintiff's 14th Amendment rights by not doing that? And if the case is out there that tells him that, shame on me for not finding it, and shame on him for not knowing it. But I haven't seen one cited in the Plaintiff's brief, and the Plaintiff's expert couldn't identify one in deposition. Thank you. May it please the Court, Nolan Reinkel for appellee Kathy Penn. Kathy Penn is the guardian and mother of Matthew Lally, the person at issue here. Mr. Lally is incapacitated as a result of the events of this case. I want to begin by discussing jurisdiction and our 28J letter. The Cady decision is the last in a series of decisions by both this Court and the Supreme Court that makes clear that where the denial of qualified immunity turns on a question of fact, those underlying facts, any appeal that challenges those underlying facts, this Court does not have jurisdiction to hear that appeal. That's clear, but what the defendants are saying is that they are not challenging the underlying facts. They'll accept everything that you've produced evidence of as to the facts. They say that the district court misapplied the law, and that, of course, is appealable on an interlocutory basis. Well, they haven't accepted the facts, Your Honor. Well, I agree with you that in their brief, the defendants state that they're doing that, and then they don't do it. I'll agree with that. But what is there in the presentation that counsel made this morning that strays from that course? Oh, well, nearly all of it, Your Honor. Okay. All right, so it's not true that Lally was placed on welfare watch? It is true. It's not true that Lally was placed in the intake area? He was placed in the intake area. It's not true that Lally was seen by nurses? He was seen by nurses, yes, Your Honor. So don't say that everything he said is almost all not true. No, I'm not saying it's not true, Your Honor. You just did say it was not true. No, what I intended to say was that he is challenging factual determinations that were made by the district court. Well, you tell me what disputed facts he's relying on. I'm not unsympathetic to a jurisdictional argument. I just don't think it's applicable the way this argument is being presented. Well, the district court found that it was an issue of fact as to whether or not Officer Winslow and Officer Escortia were deliberately indifferent. That's right. They found that. For purposes of this appeal, if appellants want to bring their appeal, they have to assume that that is true. No, they don't have to assume that that is true. They have to assume that all the facts on which the district court relied are true. They can't say that the district court was wrong when it said that a certain fact was undisputed or something to that effect. I think the Cady decision makes clear that the facts that the district court found that a reasonable jury could find. So the district court set forth, here are the universe of facts that a reasonable jury could find. Those facts are facts that they have to accept on appeal. They cannot challenge that. That's exactly right. And the key fact is the underlying, what they call the underlying merits issue of deliberate indifference. The district court found that a reasonable jury could hold that both Officer Winslow and Officer Escortia were deliberately indifferent to the known risk that Matt would commit suicide. They have to accept that as true here. Now, what they can then do is say, assuming it's true, taking the district court facts as established, that they were deliberately indifferent, that then under the qualified immunity analysis, they still have met the objective legal reasonableness prong of the qualified immunity analysis. They can make that argument. That would be a pure legal argument that under the facts outlined by the district court, they haven't, they've shown objective legal reasonableness. They can make that argument. They haven't done that, Your Honor. Their entire brief is dedicated, with a small exception, their entire brief is dedicated to attacking the notion that Officer Winslow and Officer Escortia were not deliberately indifferent. And that's been their entire presentation this morning. That is, that was, and I just want to be clear, Katie says it's not only whether it was a fact question, it's also whether the district court perceived it to be a fact question. And there's no question that if you read the district court's opinion, the district court perceived it to be a fact question as to whether or not Winslow and Escortia acted with deliberate indifference. So what appellants have to do, they have to come before you today and they have to say, yes, they were deliberately indifferent. That's what the district court held, or that's what the district court held a reasonable jury could find. With that in mind, we are now going to say that they nevertheless are deserving of qualified immunity because they meet the objective legal reasonableness prong. Now what we say in our brief, and again, they haven't done that. What we say in our brief is, okay, if you do that, if you come to the court and say, yes, we were deliberately indifferent, but we nevertheless meet the objective legal reasonableness prong, the court's decision in Camillo-Robles v. Hoyos expresses a large degree of skepticism that you can be deliberately indifferent and still meet the objective legal reasonableness prong of the qualified immunity analysis. We're not familiar with one case from this circuit where that outcome has obtained. Appellants have not cited the one. In essence, they have to, again, say, yes, we were deliberately, deliberately indifferent to the risk that this gentleman was going to commit suicide, and yet we still should get qualified immunity. That's the only argument they can make, and they haven't made it. In any event, if they were to make it, we think it would fail. So that is the thrust of our 20-A-J letter. And to be clear, when I say that they have to accept the district court's facts, it's not just that the district court found that they were deliberately indifferent. The district court found here that they went farther, that they, in fact, affirmatively worsened Matt's condition. So with respect to Winslow, the district court says that these sort of minor and utterly ineffectual steps of creating a log, that that, in fact, lulled subsequent officers into complacency. So the district court found that a reasonable jury could find that Officer Winslow made things worse, and that, again, is a fact that appellants will have to accept as true for purposes of their appeal. And then with respect to Officer Scorsio, Officer Scorsio, when she put Matt Lally back into his cell, this is minutes, frankly, literally minutes before he hanged himself with a bed sheet, she told him to sit down and shut up, and if he didn't, she would put him in a turtle suit. The district court found that that statement worsened his fragile condition, and that a reasonable jury could find that it worsened his fragile condition. So not only do appellants have to accept as true that a reasonable jury could find deliberate indifference, they have to accept as true for purposes of this appeal that a reasonable jury could find that each of these officers separately worsened Mr. Lally's condition. And that's why, if you get to the objective legal reasonableness prong, even if you separate that from the merits, which, again, I think under Camillo-Robles, there's skepticism about whether you should do that, but even if you do that, they have to say that they meant they were objectively legally reasonable when they affirmatively worsened this man's condition, and we think that is a bar that they can't meet. If this court does address the merits, and again, we think under Cady and previous precedent that that's something that's now walled off, but if the court does address those issues, I just want to respond to a few of the things that Mr. Marchese said before I came up here. First, he cited both the Brown v. Harris case and the Rillager case, and his point is to say — Brown v. Harris, is that the Fourth Circuit case? Brown v. Harris is the Fourth Circuit case, yes, Your Honor. He cites that case and the Rillager case. I believe Rillager is the Eighth Circuit case. And he says, look, if you take some steps and they simply fail, then we can't be liable. Well, Your Honor, in Brown v. Harris, they had the inmate on a continuous video surveillance. That's not what happened here. This gentleman was left alone for 15 minutes at a time when the jail's own training materials say that you can't be left alone for more than — that you can commit suicide in three to five minutes with bed sheets. And then in Rillager, similarly, they had placed the inmate on a suicide watch. He was under continuous observation from a guard. Again, that's not what happened here. He was not placed on any sort of continuous observation. So we grant, if the Knox County — if Winslow and Escorcio had taken the same steps that the guards had taken in Brown and in Rillager, this would be a very different case. They didn't take steps even coming close to that. The logbook issue, and again, we think this is a fact issue that aren't ripe here, but the logbook issue — the logbook served no prophylactic purpose in preventing this person from committing suicide. Appellants have never — attempting suicide, excuse me. Appellants have never explained how a person sitting X feet away writing something down in a book would prevent an inmate from hanging himself. And indeed, it didn't. And there's no way in which that could have happened. Because the logbook does not alert subsequent officers to the fact that Mr. Lawley was at risk of suicide. It doesn't say anything about suicide at all. And welfare watch could have been used for medical reasons. It could have been because he had a horrible, horrible migraine. It could have been because he was having problems with medication. It could have been because he had a horrible case of the flu. Serious medical conditions, no doubt, but certainly not the sort of thing that require constant observation and the sort of vigilance that comes with a suicidal inmate. So the logbook served no prophylactic effect, and the district court held that. The district court found that a reasonable jury could find that the logbook was not an effective anti-suicide technique. Same thing with the nurses. The district court refused to draw an inference that the exposure to the nurses were an effective means of preventing Mr. Lawley from committing suicide. The nurses here were not trained mental health professionals. They only would have spent three to five minutes, and I say would have because neither of them remembered even meeting Matt. All they did was they went around the jail to people who needed medication, and they handed it out. That's it. Appellants want to have this grand inference drawn from that, that because they saw him and because they didn't immediately call a mental health professional, that they somehow made a studied and considered decision that Mr. Lawley was not suicidal. The district court refused. The district court said a reasonable jury could not make that inference. Mr. Marchese says that there was a decision to assign Matt to the intake wing as opposed to the housing wing. That argument was not made below. There are no facts in the record to suggest that Officer Winslow chose one wing over the other. The record, frankly, is simply silent as to why he assigned him to the intake wing. And so, again, there's no basis for drawing an inference that that was some sort of anti-suicide technique. And, again, the district court did not draw any such inference. In closing, Your Honor, again, the Cady decision makes clear that appellants, all they can do on appeal is accept the district court's version of the facts, what the district court found a reasonable jury could find. Not agreeing with the district court's analysis of what were disputed below, but the district court's analysis of what a reasonable jury can find. They have not done that. And so we ask that the court dismiss this appeal for lack of jurisdiction. And if the court chooses not to dismiss this appeal for lack of jurisdiction, we ask that the court affirm the district court's decision to deny summary appeals. And if the court has no further questions, I'll sit down. Thank you, counsel. Thank you very much. Thank you again. Let me first begin by responding to a counsel's suggestion that the legal issue of qualified immunity has not been properly argued, either below or here. In our principal brief, we raise the issue at pages 41 to 48 with respect to Winslow and 58 to 61 with respect to Escorcio. And in our reply brief at pages 26 to 30, and it's replete in our brief below. This is not the first time we've raised the issue. And I stood up and one of the very first things I said today was one of our big legal challenges is the manner in which the district court undertook the qualified immunity analysis. What do you say to the appellee's contention that jurisdictional considerations prevent us from letting you challenge the district court's essentially factual finding that each of your, that a jury could find each of your clients guilty of deliberate indifference? Two responses, Judge. First of all, we can't challenge the factual findings which underlie the conclusion that there could be deliberate indifference. But we can challenge that legal conclusion. There are legions of appellate cases where that issue has been raised. And Brown and Religert are just a couple of them. There are plenty from this circuit as well, including I think it's Feeney versus Correctional Medical Services and Kosher versus Correctional Medical Services. Second of all, we absolutely can challenge the qualified immunity issue. And what the plaintiff is really saying is, and Mr. Reichel just said it, you didn't put them on continuous watch. They did that in Brown, although there was video surveillance. They did it in Religert, which is not the case if you read the facts there. Therefore, those cases don't apply. And we've cited in our brief, the reply brief at page 16 and footnote 5, a number of cases where 15-minute watches have been found. In fact, one of the cases cited by the plaintiff in support of their position that violation of a jail policy can be evidence of deliberate indifference is a case where the inmate was on 15-minute watches, and he wasn't checked for over an hour. The last thing I want to say to this, and this goes to the heart of the appeal, and I ask the court to give good consideration to this. Qualified immunity protects all but the plainly incompetent. It says that an official is entitled to that immunity, unless it would have been obvious to a reasonable corrections officer in his position that what he was doing violated the law. And we look to case law. And there is no case law that would have put Defendant Winslow or Defendant Escorcio on notice, particularly Defendant Winslow, that what they were doing violated the law. And it would gut the qualified immunity defense if this court were to hold otherwise. And so we ask that the order be reversed and remanded in order to enter summary judgment. What do you say about counsel's assertion that there's no basis in the record for finding that Winslow placed him in intake specifically because he was suicidal? The most direct answer to that, Your Honor, is found at page 250 of the appendix, which is the very first entry in the intake law, which was made not by Winslow, but by the intake officer, Jennifer Stilke, at Winslow's direction, and placed on welfare watch due to statements made during booking process and for medical reasons. Beyond that, I would refer the court to the appendix at pages 49 and 90, paragraph 100, appendix at page 91, paragraph 101 and 101A, and I think those would be the appropriate citations. Thank you, Judge.